## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.                      **CASE NO: 6:23-CR-216-CEM-RMN**

MICHAEL ANGELO TOLLEN,

      **Defendant.**

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

MICHAEL ANGELO TOLLEN ("MR. TOLLEN"), through undersigned counsel, respectfully submits this sentencing memorandum, seeking appropriate punishment that is sufficient but not greater than necessary to serve all purposes of sentencing under 18 U.S.C. § 3553 (a)(1)-(7).

## PROCEDURAL HISTORY

Mr. Tollen was arrested on October 24, 2023 and had his initial appearance on October 25, 2023. Doc 4. He was appointed counsel on October 25, 2023. Doc 7. On March 11, 2024, Tollen pled guilty to all four counts of the indictment without a plea agreement. Doc 38. His sentencing is scheduled for July 30, 2024, before this Honorable Court.

The PSR in this case, accurately sets forth the crimes committed by Mr. Tollen in this case. These crimes are significant and Mr. Tollen accepts

responsibility for committing these crimes.  He knows he will be sentenced to a term of imprisonment followed by a term of supervised release.  He accepts responsibility and stands ready to accept his punishment.  In determining a fair and reasonable sentence, the Court must take into account all of the factors found in 18 U.S.C. § 3553(a)(1)-(7).  In making an individualized assessment of Mr. Tollen, the undersigned would ask this Court to consider numerous factors.

### History and Characteristics of Michael Tollen and Circumstances of the Offense

Mr. Tollen is 76 years old.  He is an American citizen, having been born in New York City in 1948.  Prior to this case, Tollen had never been convicted of a crime.  In fact, he had never been arrested.  Tollen was raised by an extended family consisting of his parents and his paternal grandparents. Although Tollen's basic needs as a child were met, he was subjected to physical and emotional abuse from his father, who was an alcoholic and who used heroin on a regular basis.  At the age of twelve, Tollen's father introduced him to marijuana, which he started smoking regularly as a teenager. When Tollen's father was drunk or high, he was physically abusive to Tollen's mother.  Tollen and his siblings witnessed this abuse on a regular basis.

When Tollen was six years old, he was sexually abused by a neighbor who was a teenage adult.  At about the time Tollen became a teenager, he moved to

2

Santurce, Puerto Rico to live with his grandparents.  Tollen's mother stayed in New York and his father moved to Honduras.  Tollen loved his grandparents, who treated him like a son while he lived in Puerto Rico.  Still, Tollen suffered from the perceived abandonment of his parents.

When Tollen turned nineteen years old, America was involved in the Vietnam War in Southeast Asia.  Tollen wanted to do his part and he enlisted in the United States Air Force during a time when American casualties were escalating.  Tollen was deployed to Vietnam and served a tour of duty there.  While in the service, Tollen achieved the rank of Sergeant and received the Vietnam Valor medal.  *See* Tollen's DD-214, Exhibit C-1.

When Tollen returned home from the war, he was depressed and sometimes suicidal.  He was diagnosed with PTSD and received counseling from the Veteran Affairs Administration.  He continued to receive counseling through the 1970's.  At one point, the Social Security Administration approved Tollen for disability assistance.  While in the Bureau of Prisons, Tollen would like to participate in mental health counseling.   Dr. Chelsea Bennett, conducted a psychological evaluation of Tollen.  *See* attached Exhibit E.

Tollen married in 1975 and had a child with his then wife.  That child is now 47 years old and lives in Orlando.  After that marriage ended in divorce, Tollen married his current wife, in 1980, in Puerto Rico.  They have one son

together, Mark Anthony Tollen, who lives in Palm Bay with his family. Mark

Tollen is also the father of AT, the victim in this case.

Mark Tollen has written a letter to this Court describing what his father

meant to him while growing up. The letter is attached at B-2. In his letter, he

indicates the following:

> I could not have achieved my success without the guidance, as a
> child, of my father. My father at a very young of 7, signed me up
> for a little league baseball team. My father was my guide, he
> always made sure I had the best instructors to teach me how to
> properly play the game. Unbeknownst to me at the time, he was
> preparing me to be a leader.
>
> We moved to Florida from Puerto Rico when I was 13 years of age.
> My father moved us here so that we could get the best quality of
> life. It was difficult at first, but then I made friends through the
> game of baseball. After high school, I attended the Naval Nuclear
> Program which I successfully passed my board exam and received
> a certification to operate nuclear reactors by the U.S. Department
> of Energy.

Tollen's wife, Arlyn Tollen, has also written a letter on behalf of her

husband. *See* B-1. Specifically, Ms. Tollen relates the following regarding her

husband:

> During our marriage I can honestly say that Michael has always
> bee a great provider and an excellent father. Michael has helped
> many young me achieve their dreams, through education and
> sports. Michael was involved with helping the baseball team
> members become better players. He was also a father figure to
> many of them. We both have great memories from Michaels
> involvement at the Florida Air Academy.
>
> When my father became ill with Alzheimer's Disease, Michael
> suggested we both leave Florida and move to Puerto Rico to help.

Michael did not have any reservation of leaving to go care for my father, and for this I cannot thank him enough. Michael has always been caring and takes pleasure in helping others, he has always been this way. I admire his compassion to help others in need.

He has also helped me with my two uncles who were apart for many years. Michael thought it would be a good idea to reunite them after being apart for 30 years. Today my two uncles live together in Manhatanville Health Care Center, New York.

The undersigned asks this Court to give strong consideration to Mr. Tollen's positive history and characteristics in determining a fair and reasonable sentence. His lack of any criminal history, his service to his country and his positive influence on his children and his dedication to his wife, as well as his mother and father-in-law when they were suffering from physical ailments as they grew older.

The undersigned also understands that this court must consider the circumstances of the offense charged. Tollen is extremely remorseful for his actions in this case. He pled guilty, to all four counts, without a plea agreement from the government. He has accepted responsibility for his crimes. He knows that he has caused much pain to the people he loves. Specifically, his granddaughter, AT. He has also caused pain to AT's mother, father and grandmother, his wife. While the family remains supportive of Mr. Tollen, they know that the family unit can never go back to where it once was. He knows that even as the family forgives, they cannot forget. For this, he knows that he must go to prison. He stands ready to accept that punishment.

The Probation Office prepared a pre-sentence report in this case. The Probation Office has scored Tollen at a Total Offense Level 41, prior to any reduction for acceptance of responsibility. With the three-level reduction for Acceptance of Responsibility, pursuant to USSG § 3E1.1(a) and (b), the Probation Office scores the Total Offense Level at a 38 for a sentencing range of 235-293 months. PSR ¶ 70.

The undersigned has objected to the 12-level increase imposed by the Probation Office, by way of cross referencing the offense conduct to a different statutory provision. PSR ¶'s 14, 23, and 30. *See* also PSR, pages 19 and 20. The undersigned filed detailed objections to this scoring, citing to appellate cases from other circuits. PSR, pages 22 through 27. In their response to these objections, the Government did not address the cases cited by the defense. PSR, pages 28-29. In siding with the government's argument, the Probation Office also did not respond to the cases cited by the Defense. PSR, pages 19-20.

If the Court agrees with the Defense's position, the base offense level will be reduced from a 30 to an 18. The defense also objects to the Probation Office enhancing the offense level by two levels for Obstruction, pursuant to USSG § 3C1.1. PSR ¶'s 25 and 35. *See* also PSR, page 29.

Thus, if the Court sustains the Defendant's two objections, the Defendant's sentencing range will be 51-63 months. *See* PSR, page 21. If the

6

Court agrees with the government, Defendant's sentencing range will be 235-293 months, which is 184 months (or 15.4 years) from the low end of the higher guideline range.

The PSR states that the victim's father told FBI agents that she has an IQ in the sixties.  PSR ¶ 23.  There is no documentation of IQ testing in the record.  While the PSR uses the term "mental retardation," the Diagnostic and Statistical Manual of Mental Disorders, Version 5-TR (the "DSM") uses the term Intellectual Developmental Disorders ("IDD").  DSM at 38-39.  A diagnosis of IDD requires significant deficits in three areas: A) general mental ability, B) impairment in everyday adaptive functioning and C) onset is during the developmental period.  DSM at 41.

Criteria A is "typically measured with individually administered and psychometrically valid, comprehensive and culturally appropriate tests of intelligence."  DSM at 41.  Individuals who are diagnosed with IDD typically have an IQ of approximately 70-75.  DSM at 41.  This Criteria makes clear that the group IQ tests often used in schools are not valid instruments to diagnose or rule out IDD.

Criteria B "refer[s] to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM at 43.  Like IQ, "[a]daptive functioning is assessed using both clinical evaluation and individualized,

7

culturally appropriate, psychometrically sound measures." DSM at 42. "Criterion B is met when at least one domain of adaptive functioning – conceptual, social or practical – is sufficiently impaired that ongoing support is needed in order for the person to perform adequately across multiple environments, such as home, school, work, and community." Given the victim's age, the only criteria in question are A and B. DSM at 43.

The DSM makes clear that diagnosing IDD is a complex process:

> A comprehensive evaluation includes an assessment of intellectual capacity and adaptive functioning; identification of genetic and nongenetic etiologies; evaluation for associated medical conditions (e.g., cerebral palsy, seizure disorder); and evaluation for co-occurring mental, emotional, and behavioral disorders. Components of the evaluation may include basic pre- and perinatal medical history, three-generational family pedigree, physical examination, genetic evaluation (e.g., karyotype or chromosomal microarray analysis and testing for specific genetic syndromes), and metabolic screening and neuroimaging assessment.  DSM at 42.

Diagnosis of IDD in children and adolescents is further complicated by the fact that while the "disorder is generally lifelong, severity levels may change over time."  DSM at 43.  Critically, "[e]arly and ongoing interventions may improve adaptive functioning throughout childhood and adulthood.  In some cases, these result in significant improvement of intellectual functioning such that the **diagnosis of intellectual developmental disorder is no longer appropriate.**"  DSM at 43-44 (emphasis added).

Neither the Government or the Probation Office have provided any documents that purport to satisfy even remotely any of the criteria discussed above. Moreover, there is no evidence as to how the diagnosis was made: Was the treating clinician qualified to render the diagnosis; what instrument was used to measure IQ – the DSM makes clear that IQ must be measured via an individually-administered and psychometrically appropriate test; what age was the victim at the time of diagnosis? There is no evidence that an individually administered IQ test was ever administered. There is also no evidence of the age at which the purported diagnosis was made. None of this is addressed in the PSR or the government's sentencing memorandum.

The DSM states that, with appropriate supports, young people can essentially outgrow the diagnosis. The victim will attend private school next year in Brevard County. A review of the school's website shows that it is not a school for students with any type of specific disability, much less IDD. There is nothing to support an assertion that the victim is currently intellectually disabled.

The PSR also states that the victim's father reported that she was diagnosed at some point with "obsessive compulsive disorder, attention deficit disorder, anxiety and autism." Again, there is no documentation confirming any of these diagnoses, the time at which they were made, the clinician(s) who made the diagnoses or whether the victim still suffers from these disorders.

9

Like IDD, the DSM sets out detailed and specific diagnostic criteria each of these disorders; there is not a single record or objective fact confirming that the victim suffered from these disorders at any time.

A diagnosis of Attention Deficit Disorder ("ADD") is similarly complex. DSM at 68-71.  It also includes a specific durational criteria: "Six (or more) of the following symptoms (list of symptoms attached as Exhibit B) have persisted for at least **6 months** to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities." DSM 68-71 (emphasis added).  There is no evidence that the victim ever met any of the diagnostic criteria at any time much less for the required duration.

A diagnosis of Generalized Anxiety Disorder ("GAD") also requires that the symptoms occur for at least six months.  DSM at 250.  "Several features distinguish generalized anxiety disorder from nonpathological anxiety. First, the worries associated with generalized anxiety disorder are excessive and typically interfere significantly with psychosocial functioning, whereas the worries of everyday life are not excessive and are perceived as more manageable and may be put off when more pressing matters arise.  Second, the worries associated with generalized anxiety disorder are more pervasive, pronounced, and distressing; have longer duration; and frequently

10

occur without precipitants." DSM at 251. There is no documentation of any of these symptoms or their duration.

Finally, manifestations of Autism Spectrum Disorder ("ASD") "vary greatly depending on the severity of the autistic condition, development level, chronological age, and possibly gender; hence, the term *spectrum*." DSM at 61 (emphasis in original). Given the lack of documentation, it is important to note that the symptoms of ASD "are often most marked in early childhood and early school years, with developmental gains typical in later childhood in at least some areas." DSM at 63. There is no information course of the alleged disability, and the specific manifestations in the victim.

Critically, there is absolutely no objective evidence showing how IDD, ADD, GAD and ASD might render the victim "incapable of appraising the nature of the conduct." 18 U.S.C. 2242(2)(A). The Government did not respond to any of the cases cited by the defense in their PSR objections showing that this statute is applicable when the victim is asleep, drunk or drugged. *See* PSR Objections, pages 22-26. A developmental disability was only found to render a victim "incapable of appraising the nature of the conduct" when the disability was so severe that an expert witness testified that the victim "did not understand that the sexual penetration by defendant was inappropriate." *United States v. R.D.A., Jr.*, 156 F.3d 1245 at *1 (10th Cir. 1998) (unpublished decision). That is simply not the case here. Not only did the victim understand

that the behavior was inappropriate, she was able to understand that it was more than "inappropriate" and did online research to determine if the conduct was also illegal. Discovery at 0017.

The Probation Office has determined that the base offense level is a 30, based on a cross reference to 18 USC § 2242(2)(A).  The Probation Office does not offer any case law to support its position.  The Probation Office cites to the fact that a family member has indicated the victim has the maturity level of a young child, that the victim was non-verbal for the first seven years of her life and was diagnosed at 18 months with Autism.  PSR, pages 19-20.  The Probation Office does <u>not</u> point out that the victim has been attending public school and is scheduled to enter ninth grade in the Fall semester.  The victim is no longer non-verbal and, while she was held back a grade in a previous year, she attends school on a regular schedule.  This Fall, she will be enrolled in a private school.

With regard to this enhancement, the victim was able to tell the investigators about her sexual contact with Tollen.  She was interviewed on October 15, 2023 by investigators and again on October 24, 2023.  PSR ¶'s 12, 13, 20, 21, 22.  The victim went into great detail about what happened to her. Additionally, the victim was able to tell investigators that Tollen did similar things to her on prior occasions going back more than a year.  PSR ¶ 13.  Based <u>solely</u> on the victim's statement of prior sexual activity with the Defendant,

the Probation Office has assessed a five-level increase in the offense level since the Defendant committed other sex crimes on the victim on prior occasions. PSR ¶ 37.  If the victim was able to recall – in detail – a number of prior sex acts with the Defendant, she clearly was able to "appraise the nature of the defendant's conduct."  In fact, if the government was consistent in their argument that the victim did not "appraise the nature of the defendant's conduct" they should object to the five-level pattern enhancement – not support it.

In their sentencing memorandum, the government attempts to support its argument that 18 USC § 2242(2)(A) should apply to this case.  Doc 49, pages 3-6.  None of the cases cited by the Government apply Section 2242(2)(A) to a specific set of facts, much less facts comparable to those at issue here.  The cited portion of *United States v. Julian*, 427 F.3d 471, 479-80 (7th Cir. 2005) quotes the relevant language from Section 2242(2)(A) in summarizing the defendant's alleged conduct: "Count One of the indictment charged that [the defendant] had conspired with others to travel in foreign commerce for the purpose of engaging in illicit sexual conduct, in violation of 18 U.S.C. Sections 2423(b) and (e) . . . Knowingly engaging in a sexual act with a person under the age of 18 amounts to a crime within the maritime or territorial jurisdiction of the United States when the juvenile is incapable of appraising the nature of the act, *see* 18 U.S.C. Section 2242(2)(A), or when the juvenile is 12 to 15 years

13

old and at least four years younger than the person engaging in sex with him, *see* 18 U.S.C. Section 2243(a) . . . A petit jury convicted [the defendant] of both charges."  The conduct at issue involved sexual exploitation of children as young as seven and there is no discussion of the meaning of the phrase "incapable of appraising the nature of the act" under Section 2242(2)(A). *See* Julian 427 F.3d at 476 (the victims "ranged in age from seven to 18 years old.").

The government's citation to *United States v. Walker*, No. 17-CR-184-pp, 2018 WL 3325909 (E.D. Wis. 2018) is similarly inapposite.  The discussion of Section 2242(2)(A) in *Walker* is solely for the purpose of determining what tier offender the defendant was for purposes of registration under SORNA.  *See Walker*, 2018 WL 3325909 at *5 (main question before the court was "[w]hat is the [d]efendant's tier classification" under SORNA where defendant was charged with failing to register).  While the Government quotes a lengthy section of the opinion speculating about the meaning of Section 2242(2)(A) ("if one **assumes** that children under the age of fifteen are "incapable of appraising the nature" of sexual contact/assault" (emphasis added)), it ignores two key facts: 1) "[n]either party compared the Colorado statute with [2242(2)(A)] despite the fact that this is one of the offenses listed in Section 2244;" 2) the victims in the underlying state case were four and six years old.  *Id. at *7 and *2* ("the government had established that the victims of the state offense were

four and six years old.").  The cited section of *Walker* is completely irrelevant to Mr. Tollen's case.[1]

The Government also cites *United States v. Bryant-Royal,* No. CRIM. WDQ-12-0040, 2012 WL 3253165 at *3 (D. Md. Aug. 6, 2012) which supports Mr. Tollen's arguments.  In *Bryant-Royal,* the Court dismissed a count of an Indictment alleging a violation of Section 2242(2)(A) because the language in the Indictment "merely track[ed] the language of the Statute." *Id*. at *3.  While the Court states in its discussion that a "person **may** be incapable of appraising the nature of the conduct because of a developmental disability or the influence of drugs," it reached no conclusion about the applicability of Section 2242(A)(2) to the facts of the case because it dismissed that count of the Indictment. *Id*. at *3 (emphasis added).  In fact, the Government proffered evidence in opposition to the Defendant's Motion to Dismiss that the victim "drank alcohol [at a party] and became heavily intoxicated to the point where she could not walk without assistance. . . . thereafter lost consciousness and had to be carried into the

---

[1] None of the cases cited in *Walker* have any relevance to Mr. Tollen's case. *United States v. Britt*, 576 Fed. App'x 959 (11th Cir. 2014) (cited Section 2242(2)(A) solely for purpose of determining propriety of pattern enhancement under U.S.S.G. Section 2G2.2(b)(5), victim was a three- or four-year-old boy); *United States v. Burke*, 80 F.3d 314 (8th Cir. 1996) (merely noting that charge under Section 2242(2)(A) was dismissed as part of a plea agreement); *United States v. Medicine Horse*, Case No. CR-11-35, 2012 WL 1999525 (D. Mont. June 4, 2012) (court simply stated charges in ruling on defendant's Motions to Suppress and to Allow Lay Opinion Testimony).

bathroom where she continued to get sick and lay on the bathroom floor." (internal quotations omitted).

The cases cited by the Government are either irrelevant or support Mr. Tollen's assertion that Section 2242(A)(2) is only applicable where the victims are impaired to the point where they are not able to understand what is happening to them, such as when a victim is intoxicated, asleep or is in a coma.

Finally, if, as the government suggests, the victim in this case was incapable of appraising the nature of the sexual conduct in this case, perhaps the government should have sought a grand jury indictment charging Tollen pursuant to 18 USC § 2242 (2)(A). The government did not do so because the government did not have any evidence to support such an indictment. In good faith, Tollen has pled guilty to every count that was charged against him in the indictment. He has <u>not</u> objected to the five-level pattern enhancement levied against him. He is ready to move forward so that his family can heal and put this dark chapter behind them.

Respectfully Submitted,

A. Fitzgerald Hall, Esq.
Federal Defender, MDFL

16

*/s/James T. Skuthan*
James T. Skuthan, Esq.
First Assistant Federal Defender
Florida Bar Number 0544124
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: 407-648-6338
Facsimile: 407-648-6095
Email: jim_skuthan@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that undersigned attorney electronically filed the foregoing *Sentencing Memorandum* with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to Assistant United States Attorney, Kara Wick, this 25th day of July 2024.

*/s/James T. Skuthan*
James T. Skuthan
Counsel for Defendant